Our second case for this morning is Williams v. YRC Worldwide. Mr. Mullen. Good morning, Your Honor. It's good to be before this tribunal today. I think we'll get to the heart of the matter very quickly here. And I think if... So before you get to the heart of the matter, I wanted to ask you about our jurisdiction because on page three of your statement of the case, you indicate that this appeal is from the grant of summary judgment on the claims of four people, Williams, Harris, Jackson, and Rios. And then there are the claims of a bunch of other people that remain pending in the district court and are set for trial beginning on a certain date, which I gather has been changed. But that certainly makes it sound to me like there is no final judgment. And I looked to see if there was a Rule 54B certification, and I didn't find one, although that may not be the last word. But can you please tell me what's happening? Are there other people who are part of this litigation whose claims are not yet resolved? There are other people who are part of this litigation that their claims are not involved. There was 15 original plaintiffs. All of them brought suit in their own individual capacity. There was no class action. But all part of this case. All part of this case. And so what has me concerned is that the definition of a final judgment is a judgment that resolves all claims of all parties, and it sounds as though we don't have that. All claims of these four parties have been resolved. But of all parties. All parties. Yeah. That's the line. It's all claims of all parties, and if some parties' claims have been finally resolved, the rule, Rule 54B, provides a mechanism to go to the district court and see if the district court will certify that there's no just reason for delay and that it's final as to these four. But I, again, correct me if I'm wrong. I did not see a Rule 54B certification. There is no 54B, Your Honor. So I don't see how this is a final judgment. Your Honor, I believe it's a final judgment because it resolved all claims to all four separate. If I would brought... Counsel, I must join the Chief Judge. It is essential to finality that it resolve all claims with respect to all parties. It's a foundation stone of federal appellate practice. If I... Rule 54B creates an exception. I, too, look for a Rule 54B order. There appears to be none. You agree with that? That is truly right. Then this is just open and shut, no jurisdiction. Your Honor, I would say to you that these are 15 joint claims. That doesn't matter. That doesn't matter. I mean, you're talking to three procedure teachers, I guess. It... No, I've been trying to decide whether the proper thing to do, given the lack of... What I thought was, and I'm now thinking for sure, is a lack of appellate jurisdiction would be for us to order a limited remand to the district court. If the district court were so inclined to issue a Rule 54B, then this panel would be just dismiss. But it's a... As Judge Easterbrook says, it's a foundational limitation on our authority and probably for good reason. I'll give your case as an example. There were a number of people who worked as these combo drivers who had very similar complaints about the business practices, the alleged business practices of YRC's Bolingbrook Terminal. It strikes me there could be some efficiencies in taking the appeal once everybody's claims are resolved. Things might come to light. Maybe not. I mean, the district court might think that there are enough differences between these four people and the others who are going to have a trial. I can't say. But the motivation of the rule is efficiency. I think a ruling by this court may give us a lot of clarification as to the other 11  Well, it might, but that's... I mean, a lot of times people would like an interlocutory appeal for just that, and there are some provisions in the rules for that, 1292B, for example, but that sets a pretty high bar for interlocutory appeals because of the normal preference for resolving things all in one package. I mean, I'm willing to let you say a word or two about the merits of your appeal, but my main question was whether there was a 54B order, and since there isn't, I just want you to be aware that that's a big problem. Your Honor, and I think the question that will go on throughout this is what is an adverse employment action? And admittedly, there's no money difference here, but there are tangible job benefits in the form of seniority... Please just stay at the podium. I'm sorry, Your Honor. That's where you'll be recorded. There are tangible job benefits in the terms of seniority rights, and YRC has never given an explanation for this. The contract is very clear. The contract says, hey, these are all combo drivers. You have to have a CDL. You all have exactly the same job description. But the contract says in March of every single year, you're to bid on your job assignments and start times for the year. YRC says, we don't do that here. There's no explanation for why they do that. Had they followed this rule, they could not have discriminated against my client because there's a valid seniority system in place. So what happens is that by doing this and by making this lie from the get-go, they're going to send the drivers wherever they want. And they send all the black drivers to the city, more or less, and they send all the white drivers to the suburbs. Why does that matter? Because the city routes are much harder physically, more dangerous. And when you think about your seniority rights, one of the things that you really want with seniority rights is picking and choosing your... Now I'm getting even antsier here. If you're talking about seniority rights and your brief says they are covered by a collective bargaining agreement, Teamsters Local 179, the only way collective bargaining rights can be enforced in court is through hybrid agreement duty of fair representation litigation. And we don't have the union as a defendant here. So the entire suit, if this is an attempt to enforce the seniority clause, goes nowhere. No, Your Honor. It goes... The only thing you can enforce is Title VII. Seniority clause is outside the scope of litigation. And I'm not trying to enforce the seniority clauses. What I'm saying is ignoring the seniority rights is part of the lie that was told, the why they could do this. But I thought the seniority rights gave priority to more senior employees in terms of bidding the timing of routes, but not necessarily the routes themselves. That's exactly what... And you didn't counter that in the summary judgment. That exactly was done. And so when my clients finally got enough seniority to get the good routes, they were still told, no, you're going to the city. Eventually they got enough seniority to get the time slots they wanted. But they were told, no matter what time slot you pick, you're going to the city. And what I'm saying is that there's a fundamental harm, even though they're all union, they all get paid the same amount per hour. If I put a black restroom and a white restroom at YRC's Bolingbrook plant, said all the blacks got to go in here, and all the whites got to go in here, that I don't think this court would have any problem saying that's discrimination. But there's no adverse employment action there. There's absolutely none. What does it matter if a white guy's got to walk five more feet, or a black guy's got to walk five more feet to go into a restroom? Well, it's different terms and conditions of employment, but I mean, this actually leads me to another concern I had about your brief, which is pretty sparse on factual support for the arguments that you're making. It's very hard to track through the citations to the actual record. Who were the comparables? What's the real difference? Are all of these routes the same? I mean, clearly, driving routes in the city was part of the business of this company that these folks work for, so somebody's going to have to drive in the city. Most of the factual basis was put in the 56.1 response to all 175 paragraphs. Right, but you're supposed to make it possible for the Court of Appeals, without too much trouble, to track down those factual assertions. Well, and the district court faulted you for not actually pointing to the record in your 56.1. She still considered the arguments, Your Honor. She still considered all the arguments. She did. But to Chief Judge Wood's point, you didn't specify factual support for your claims in your Rule 56 motion, just like you didn't in your brief before us. Your Honor, it's fundamental in this case that when you assign jobs on the basis of race, there's a harm there, whether or not it's in your wallet, but it's in the dignity of every man or woman, but there's no women out there. And the ability for YRC to literally have... But under Twombly and Iqbal, it is necessary to go beyond simply asserting such a claim. You have to provide enough factual background to make it plausible that this offense, I don't disagree with you, that assigning on the basis of race is prohibited by all sorts of things, Title VII included, 1981, other law, but it's necessary to do something other than just say, I say you're doing this. And we did, Your Honor, and it's contained in there, for example, Carl Harris. Every single day, the white driver doing the same route that he did, picked which stops he's going to, and literally took boxes off of his truck and put them on Carl Harris. Carl Harris... I mean, you did add a lot of facts in your reply brief, but on another point of appellate procedure, I mean, that's too late. You need to put them in first. They were in my 56.1B response, Your Honor. But I did elucidate them or put them more in the brief when I put them out. So on a daily basis, when you're getting, you know, when somebody, a white driver is literally shoving stuff on your truck, and you tell your supervisor who ignores it, and you tell his supervisor. And then you need to understand why that's on account of race. I mean, it might be a very obnoxious thing to do, but why it's racially based is a critical part of the case. Anyway, if you want to save a minute or two for rebuttal, I would recommend that you do that. Mr. Herka, Mr. Herka, you, too, bear some blame for this jurisdictional problem, since appellees are supposed to examine the jurisdictional statement the appellant provides, and if it's not complete or correct, and you say it's incomplete and incorrect, but then you don't say anything about finality. May it please the Court? That is correct, Your Honor. We were under the impression that the court's judgment, district court's judgment, was, in fact, a 54B certification. How did you get that impression? Well, Your Honor, the... There must be some document reflecting a Rule 54B. Well, it's not only the judgment, Your Honor, but the fact that the court had assigned costs to us as the prevailing party. And then, furthermore, the court verbally advised... Look, look, we don't make appellate jurisdiction turn on impressions. We make appellate jurisdiction turn on documents. There has to be a Rule 54B judgment. Your brief doesn't mention one. You have everybody up here looking for it. Impressions don't cut it. I understand, Your Honor, but it's also the fact that the district court judge invited the appellant here to file an appeal. So based on that, we were of the impression that this was... I don't think there is a district court judge involved in this case. The magistrate judge, Your Honor. That's correct. The parties did consent to the magistrate district judge. Which is all fine, but it's one thing to invite an appeal and quite another thing to specify the time. And as I gather, it was my impression that the trial for the remaining people has now been pushed back a bit. It was supposed to be June and now it's later. Is that correct? That is correct, Your Honor. Potentially September or later. Okay. So, I mean, that's not forever, but it's quite a bit of time. And surely there are some common issues. Are the allegations materially different for those whose cases are going to trial? From our perspective as the appellees, they are. In fact, we did move the court to bifurcate or separate the individual claims and cases. The magistrate judge denied that motion. But it is our position that these are individual claims that each plaintiff below must prove themselves. This is not a pattern of practice claim. It is not a... Sure, it's a disparate treatment claim, I take it. Exactly, Your Honor. But sometimes in disparate treatment claims, there are common issues. And indeed, Rule 20 might assume that there need to be some common issues before you're going to group people together, such as what the company's policy was for assignments or the factors they took into account or who the responsible manager might have been for assignments or how complaints wind up getting processed. I can think of a lot of things that would not vary from person to person. Yes, Your Honor. And that is what the court ultimately concluded in denying our motion, that there is sufficient overlap with regard to the parties, management, the same facility, et cetera. So I think for both overlap and for efficiency purposes, the court decided to maintain it as a single action with multiple plaintiffs. But it is my belief and my client's view that these are individualized claims. But with regard to the 54B certification, the court is correct. There wasn't a certification in writing. It's not a certification. It's a judgment. Right? A certification would refer to something like 1292B, and there would be no basis for a 1292B certification after claims with respect to particular parties have already been resolved, since its foundation is shortening the time to resolution. Yes, Your Honor. That is correct. So with regard to the rule 54B certification in the judgment, you are correct. There is none that is out there. Would the court care to hear of the merits as well? You are welcome to say a word or two about the merits, but as I warned your opponent, I think the jurisdictional issues are going to come first in our concern. All right. I'll just briefly address the merits, Your Honor. I think that this court aptly noted the fact that effectively the appellants here had waived a number of their arguments because they had not presented facts in their briefing. In fact, in their arguments— But you know, I mean, waiver is one thing. I know you argue that. It wasn't that hard to figure out from their brief what they were trying to argue, whether they supported it properly, you know, at the next level, there's a lot you might say, but we all understand what this case is about, don't we? Your Honor, yes. In fact, the magistrate judge went out of her way to give every benefit of the doubt to the plaintiffs, the appellants in this case, looking at not only the pleadings, but looking at our statement of facts, their responses, the record, did a fine job of putting together the arguments that weren't actually in the briefing itself. And based on that, the court aptly found that the three of the four had not suffered an adverse employment action, specifically with regard to the route assignments. Because as you noted, these are legitimate routes that are part of the business, and people drive— Race. Of course not, Your Honor. You certainly cannot do that. Right. Okay. But what the plaintiffs failed to demonstrate here was that, one, linking the route to race, and then two, identifying how the specific route was an adverse employment action. And as you noted, these are legitimate routes within the job description, and they were unable to identify or present any evidence demonstrating these routes were somehow peculiar or different. They summarily testified and stated that they found that some of the routes were more dangerous or that they were more likely to cause accidents, but they had no evidence to support that. That was just their conclusion. They said— So they just said it's more dangerous, but they didn't come up with police statistics for those areas or anything of that sort? Well, except for Ria's, where they had the evidence he had a gun pulled on him. Exactly, Your Honor. And that's the one—he's the one individual for whom the court found had fulfilled that adverse employment action, although we dispute that because an action by a criminal conduct by a third party, I don't believe can constitute an adverse employment action because it's not the employer's conduct. But nonetheless— It could have been a dangerous route, though. Well, and I think that's why the court gave Ria's the benefit of the doubt by saying, I'll assume that's adverse employment action, and then look to pretext, or the legitimate business response and then pretext. So with regard to the three, there was no adverse employment action with Ria's because of the being held at the gunpoint did find adverse employment action in that one scenario. Were there any statistics about gun incidents in the suburban towns? There were no statistics whatsoever presented on summary judgment or in the case at all. And I'll just note for the record, I know it's in our briefing, but what the appellants refer to as the city routes aren't actually the city of Chicago. They're talking about places like Midway and Malvos Park, and they call it the city because they're closer. So Midway means like the Midway Airport? Yes, Your Honor. That's in the city of Chicago. That's in the city. I saw this, Midway is not in the city of Chicago, and I thought, since when? Midway Airport is definitely in the city. Well, and you're right. It is literally within the city of Chicago confines, but what they characterize it as as being in the downtown area, congestion, difficulties such as that, and they try to portray it as if somehow Midway neighborhood is different from any other neighborhood within the area. But to your point, they didn't present any statistics or evidence demonstrating any one to drive in, or more hostile, or higher crime rate, nothing of that. Rios is the only one who actually suffered any kind of adverse action in the form of being held at gunpoint one time, and that's why the court went to the next step of analysis, which is, do we have a legitimate business reason for assigning routes? And the court found yes, and there were a number of factors they looked at, including the hours each individual employee has left on their shift, and you have to assign the hours based on that, the start time of the shift, and then the volume of freight, customer needs, efficiency. And the court found that this was a legitimate explanation as to how routes were put together and assigned. The appellants here failed to come back and present any evidence of pretext whatsoever. And so based on that, the court said they did not fulfill their burden of the Prime Fisher case in developing pretext, and ultimately the facts are undisputed. I'll just briefly note, the issue that was raised in the briefing on appeal about the collective bargain agreement was not presented to the court below. In fact, in footnote four, the court said, to the extent YRC was not following the procedures for work assignments detailed in the collective bargain agreement, plaintiffs may have a cause of action under labor laws, but that fact is not relevant to the issues presently before the court. Right, so the court carves it off and says this is not, in fact, a hybrid case. Exactly, Your Honor. It was not pleaded. It was not alleged. It was raised on argument for the first time on summary judgment. And that's why, as you noted, I truly believe that is a waiver issue. It's not an issue before the court here today. No, no, that's different. Yeah. If there are no further questions, I will conclude. All right. Thank you very much. Thank you very much, Your Honor. Anything further, Mr. Muller? Just very briefly, Your Honor. Counsel, you need to wait until you reach the microphone. Absolutely, Your Honor. Very briefly, with respect to whether a route is more dangerous or not, or whether it's more difficult, the testimony, whose testimony would you like in that? You don't really need statistics to tell you that Cabrini-Green, when there was a Cabrini-Green, was a dangerous place to be. You can look outside in a neighborhood in Chicago and decide whether or not just how much, you know, you can see how many bars are in the windows, or how many wooden planks, or how many nice stores and lawns and nice houses. You don't have to have a Ph.D. or statistic to tell whether something is dangerous or a neighborhood is dangerous. We all know what neighborhoods we don't need to be driving in. Okay. My clients did the suburb routes from time to time when white drivers were sick. So they know the difference. And when you get seniority, as you go on, so you don't have to do these routes that are more dangerous and harder to do and to back into because they're narrow streets and all that, or physically more dangerous because of the people around. When you get older, you don't want to do those things. So when you get a good seniority number, you get to be 55 years old like myself, you don't have to do the back-breaking work. Your Honor, all the black and Hispanic drivers went downtown. Not one. There's 80 drivers approximately at any given time at YRC. All of the white drivers, none of them routinely went downtown. Every single black and Hispanic driver had the city routes. Now some they call Melrose Park and some, a couple other names which escape me right now, but they all ended up on the west side of Chicago, which a lot of those areas are a little more than fairly dangerous. Your Honors. The drivers themselves know what the good routes are. You know, Mr. Harris is walking behind, you know, he's lining up behind a white driver who literally throws the assignment back in the dispatcher's face. Says, I don't go here, I'm not taking this blank. I don't do that. She gives it to my driver, or to Mr. Harris. And Mr. Harris says, well, I don't want to do this. And she says, are you refusing a work assignment? Now this is key. Hopefully I got this well enough in my brief. When you refuse a work assignment, that's the worst thing you can do out there. That is a tantamount to voluntary quit. You can be insubordinate and throw the work assignment back in the dispatcher's face and be fired for insubordination, but you at least get an appeal. If you refuse a work assignment, and they only did this to the black drivers, not the white. When you're asked that question, they take your badge. They give you a half an hour to consider it. And if you don't reconsider it and take that work assignment, you're gone. You're walked out the door. Okay, I think that's going to have to do, Mr. Mullins. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.